Filed 11/30/15  P. v. Rachel CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H040306 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1107268) |
| v. | |
| ANDREW MARK RACHAL, | |
| Defendant and Appellant. | |

## I.    INTRODUCTION

Defendant Andrew Mark Rachal appeals after a jury convicted him of first degree murder (Pen. Code, § 187, subd. (a))[1] and found true an allegation that he personally used a deadly or dangerous weapon in the commission of that offense (§ 12022, subd. (b)(1)). The trial court sentenced defendant to a prison term of 25 years to life for the murder, consecutive to a one-year term for the weapon use allegation.

On appeal, defendant contends:  (1) there was insufficient evidence to support the jury's first degree murder verdict; (2) the trial court erred by dismissing a juror for misconduct; (3) the trial court erred by failing to instruct on voluntary manslaughter; (4) the trial court erred by incorrectly instructing the jury on self-defense; (5) the trial court erred by admitting evidence concerning defendant's ex-girlfriend; (6) the

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

prosecutor committed misconduct; and (7) trial counsel was ineffective. For reasons that we will explain, we will affirm the judgment.

## II. BACKGROUND

On May 10, 2011, Ricky Patterson suffered multiple stab wounds at defendant's residence, and he subsequently died. Defendant's neighbors had heard cries for help coming from defendant's house, and they saw defendant come out of his house and drive away. The next day, defendant fell or jumped off of a highway overpass in Santa Barbara County, resulting in serious injuries.

### A. *Defendant's Relationship with Patterson*

Patterson was an unlicensed contractor. In late 2010 and early 2011, Patterson was working with Kevin Johnson, another unlicensed contractor. Patterson and Johnson worked on various projects for Ronald Willoughby, who owned property in Berkeley. One of the projects required a licensed general contractor, so Patterson proposed that Willoughby hire defendant, who had his contractor's license. Willoughby, his wife, defendant, Patterson, and Johnson subsequently agreed that Johnson would do the painting and drywall, Patterson would do carpentry and some other work, and defendant would "run the whole thing."

During the weeks before Patterson's death, Patterson and Johnson were working together on a different project. They commuted to the job site together in Patterson's truck. During the commutes, Johnson often heard phone conversations between defendant and Patterson. Patterson would put his cell phone on speaker, so Johnson heard both sides of the conversations.

One month or more before Patterson's death, Johnson overheard defendant tell Patterson that he was not going to use Patterson or Johnson for the Willoughby job. Johnson later overheard defendant say that he had started the job. He also heard

2

Patterson tell defendant that the Willoughbys wanted their money back, referring to a $10,000 deposit or down payment.

At some point after learning that defendant was not going to use him for the Willoughby job, Johnson spoke to defendant on the phone. They argued, and defendant hung up on Johnson. Defendant then called Johnson back. Defendant said he did not have a problem with Johnson; his issues were with Patterson. Defendant told Johnson that he "could kill" Patterson.

Johnson never told Patterson about defendant's statement, but he did advise Patterson to stay away from defendant. Johnson also advised Patterson to stop being upset about defendant not using them for the Willoughby job. As recently as two days before the stabbing incident, Johnson had told Patterson to "leave it alone," but Patterson did not seem to be able to let it go.

According to Johnson, the arguments between defendant and Patterson were not just about the Willoughby job. Defendant and Patterson had "long-term issues," one of which involved Patterson getting defendant fired from being a supervisor at another construction job. The conversations he overheard included "argumentative words" and "bickering back and forth."

Between May 2, 2011 and May 10, 2011 (the day of the homicide), there were numerous phone calls between defendant's cell phone and Patterson's cell phone. There were seven calls on May 2, five calls on May 3, seven calls on May 4, three calls on May 5, no calls on May 6, 28 calls on May 7, four calls on May 8, six calls on May 9, and three calls on May 10.

### B.     Testimony of Defendant's Neighbors

Manuel Brillantes lived on defendant's street on May 10, 2011. Just before 3:00 p.m. that day, he heard cries for help and followed the sound. He encountered Phuong Phan, who lived next door to defendant. Phan had just returned home with two of her children and was in her driveway.

After confirming that Phan had also heard the cries for help, Brillantes walked towards defendant's house. Brillantes looked through a broken window and saw two men inside near the kitchen sink. Brillantes asked, "Is everything okay there?" He heard one of the men say, "Help, call 9-1-1." The man sounded weak and in pain. The second man said, "He's all right, he's all right." The second man was wiping something off of his hands.

Brillantes backed away from the house. He saw the garage door open, then saw a man in the driveway. Phan, who was in her driveway, saw that the person was defendant. Phan asked defendant, "Is he okay?" Defendant told her, "He's okay, he's okay." Defendant's hands were red, but he did not appear to be injured.

Meanwhile, Brillantes called 9-1-1. While on the phone with the dispatcher, Brillantes heard defendant say, "[H]e's all right, he's all right," and then saw defendant leave in a white truck. The white truck had been parked across defendant's driveway, blocking Patterson's burgundy truck, which was parked in defendant's driveway. Brillantes next saw a person standing up, then crawling, in defendant's garage.

Patterson was found lying on the ground in defendant's driveway, just outside of the garage, near the back of Patterson's own truck. Patterson was treated by paramedics and taken to the hospital, where he died.

### C. Defendant's Fall or Jump from the Overpass

On the afternoon of May 11, 2011, Brian Kent and his wife were driving northbound on Highway 101 in Santa Barbara County. He saw a white truck come up behind him. The truck was speeding and almost hit Kent's car two times. Kent wanted to call 9-1-1, and his wife wanted to call the number on the side of the truck. Kent followed the truck as it took an exit and went onto an overpass.

The white truck stopped on the overpass. Defendant was inside the truck. He appeared to be doing something—possibly writing. After about two or three minutes, he

4

drove forward, stopped again, got out, and walked to the overpass railing. Defendant "toppled over" the railing, with his body "almost straight as a board."

Ronald Jasso was also driving with his wife northbound on Highway 101 on May 11, 2011. Jasso saw defendant standing on the overpass. Defendant put his arms at his sides and "cartwheeled" over the railing. Defendant landed in the fast lane of the freeway, feet first, and then "crumpled." Jasso pulled over and went to see if defendant was okay. Defendant appeared to be unconscious at first, but he later tried to stand up and crawl toward the center of the fast lane. Jasso did not hear defendant say anything. Defendant was wearing clear plastic gloves on both hands.

Detectives from the Santa Barbara County Sheriff's Department searched defendant's truck, finding a note inside. The note included "$5,000 Ricky stole my money" and "Chanda was fucking not faithful." The note also listed a number of names of defendant's friends and family members. Defendant's truck also contained an empty Sominex box, Sominex pill wrappers, two empty Red Bull cans, and eight unopened cans of tuna fish.

### D.    *Patterson's Autopsy*

After his death, Patterson's body underwent an autopsy. The cause of Patterson's death was complications of multiple stab wounds of the head and extremities—in other words, extreme blood loss. Patterson had 31 penetrating stab wounds, one of which had transected a large vein and an artery. Seven of the stab wounds were one-half inch deep; all of the others were deeper.

Patterson had a stab wound near his shoulder that was over three inches long and one inch deep. He had a stab wound in the back of his head that was one and a half inches long and one inch deep. Patterson's skull had been chipped. This stab could have broken a knife blade.

5

Patterson had several stab wounds in his face. One was on the right side of his face, one was in his forehead, and one was on the left side of his face. He also had a stab wound near his left ear.

Patterson had a number of stab wounds in or around his left arm. A stab wound in his left shoulder was three inches deep; it had both entry and exit wounds. Another stab wound was below that one. He had three stab wounds in his left arm. One of those wounds was three inches deep and was "probably the most significant" of all his wounds; it was the one that had transected a major vein and an artery.

There were three stab wounds in Patterson's left hand, along with an incised wound on that hand. At least two of the stab wounds were in Patterson's palm. One of the stab wounds in that hand was four inches long.

Patterson had two stab wounds in his right arm. Stab wounds in the back of his right upper arm and in his right forearm were both three inches deep. There was one stab wound and one incised wound on his right hand.

The remaining stab wounds were all in Patterson's legs. Several of the stab wounds in his left leg were three or more inches deep. One of the stab wounds in Patterson's right leg was four inches deep, and another one had gone through his leg.

Patterson also had blunt force injuries to his forehead, the bridge of his nose, and to his chest. He had abrasions on his abdomen, back, and arm.

Patterson was five feet, 11 inches tall and weighed 262 pounds at the time of his death. Defendant was five feet, 10 inches tall and weighed 228 pounds.

### E.    Defendant's Injuries

Defendant's hands were photographed on May 12, 2011, when he was in the hospital. There were horizontal defects on four fingers of defendant's right hand. These appeared to be sharp force injuries, and they would have made it impossible for

6

defendant to grip a knife handle.[2]  Defendant had similar damage to the pinkie finger of his left hand.  The injuries on defendant's hands were consistent with his hands sliding onto the blade of the knife after stabbing Patterson and hitting bone.  The injuries could also have been defensive wounds.

### F.      Evidence Found at Defendant's Residence

Police investigators searched defendant's residence, where Patterson's burgundy truck was backed into defendant's driveway.  There was a "club" locking device on the steering wheel of Patterson's truck, and the truck's doors were locked.

A knife handle with a broken blade, which contained blood, was found in a garbage can in the garage.  A broken knife blade was found on the kitchen floor.  A broken coffee pot was also found on the kitchen floor.  When police first arrived, the faucet in the kitchen sink was running.  The bay window in the living room was broken, with a small kitchen drawer lodged in it.  A chair in the dining room was overturned.  A set of blinds in the bedroom was pulled down.

Blood was found in several locations throughout defendant's residence.  The "bloodletting" had begun in the master bedroom, where a lot of blood was lost.  There was blood on the bed, pillows, and carpet.  There was also blood in the hallway leading out to the living room and kitchen, including handprints on the hallway walls.  Some of the handprints were near the ground, indicating a person may have been crawling.  Other hand prints were higher up, suggesting that a second person had walked through the hall.  The higher handprints appeared to have been from someone who had blood on his or her hands but whose own hands were not cut.  The lower handprints appeared to have been from someone who had "quite a volume" of blood on his hands.

In the living room, there were bloody footprints leading from the kitchen to the front door and back.  There was a blood smear on the front door's dead bolt.

---

[2] Defendant was right-handed.

A large amount of blood was in the kitchen. Blood was smeared on cabinets, appliances, and the floor. Blood droplets were on top of the smears, indicating that someone bloody was "being smeared around on the floor" and someone else was bleeding on top. There was a large pool of blood under a kitchen counter, indicating that someone lost a lot of blood in that location. A blood smear on a kitchen cabinet suggested that something—such as a head or knee—had been hit repeatedly against it. The blood on the kitchen floor was consistent with Patterson being stabbed there, and higher spatter indicated that was where he was stabbed in the back of the head.

Blood spatter near a light switch in the entry to the garage from the kitchen was consistent with the hand injury defendant had suffered. Blood stains on the floor going into and through the garage were consistent with someone crawling.

A number of items in defendant's house were tested for DNA. Patterson was the major source of the DNA in samples taken from blood on the bedroom floor and from blood on items in the bedroom such as a quilt and two pillowcases. Patterson was also the source of the DNA in blood samples taken from the hallway. Samples of blood found in the kitchen contained mixtures of Patterson's DNA and defendant's DNA. Patterson's DNA was on the knife blade along with other DNA, which could have come from defendant. Defendant's DNA was on the knife handle, with Patterson as a possible contributor.

According to criminalist Cordelia Willis, the above evidence showed that defendant was not bleeding in the master bedroom, where there had been a struggle; he was injured in the kitchen, where there was a further struggle. The bloody footprints indicated that defendant had walked to the front door and back after the struggle in the bedroom and before being injured in the kitchen.

There was no sign of forced entry into defendant's house, except where the police had broken down the front door. Patterson's cell phone was found on the floor of defendant's bedroom; it had Patterson's blood on it.

8

### G. Defense Testimony

Timothy Sutherland was driving his motorcycle north on Highway 101 in Santa Barbara County on May 11, 2011 when he saw defendant lying in the roadway. Sutherland pulled over and went to see if defendant was okay. Defendant told him, "He had a knife. He came at me."

Forensic pathologist and consultant Dr. Judy Melinek testified that defendant's hand wounds appeared to be defensive injuries. She thought it was unlikely, but possible, that the wounds were caused by defendant's hand slipping onto the knife blade. She testified that if defendant had consumed the entire box of Sominex pills, he would have been disoriented and sleepy, and he possibly would have hallucinated and been delirious.

Private investigator Gregg Dietz took photos and video at defendant's residence. From the location where Brillantes claimed to have been standing when he looked inside, a person could not see into the kitchen.

Santa Barbara Deputy Sheriff David Valadez was one of the officers who responded to the scene of defendant's fall or jump from the overpass on May 11, 2011. Deputy Valadez had removed the plastic gloves from defendant's hands, although defendant had tried to prevent him from doing so by clenching his fists. Deputy Valadez did not know what had happened to the gloves.

Defendant did not testify at trial.

### H. Prior Misconduct Evidence – Chanda McClendon

Chanda McClendon had a two-year dating relationship with defendant that ended in May of 2011. At some point in April or May of 2011, defendant told McClendon, "I can't take too much or I'm going to snap," referring to "his pressures."

On May 2, 2011, McClendon was parking in a garage at her school when defendant showed up. Defendant blocked McClendon's car in with his white truck. He approached her, behaving "erratic" and "crazy." Defendant threatened to kill himself.

9

Later that same day, defendant again blocked McClendon's car, but he eventually allowed her to move her car. McClendon called 9-1-1 and drove towards a police station. Defendant followed her and pulled up alongside her when she parked. McClendon subsequently obtained a restraining order.

A search of defendant's computer after the Patterson homicide showed that defendant had performed a number of Google searches following the McClendon incident. On May 2, 2011, defendant had searched for "how to commit suicide with sleeping pills." On May 4, 2011, defendant had searched for "how to get out of a restraining order." On May 6, 2011, defendant had performed a number of searches containing McClendon's name as well as searches such as "how to disguise your looks." On May 7, 2011, defendant had searched for "the death of Andrew Mark Rachal" and the definition of stalking.

## I.     *Prior Misconduct Evidence – Diane Williams and Gail Seahorn*

On March 28, 1998, San Jose Police officers were dispatched to a residence in response to a domestic dispute call. The officers contacted defendant and Diane Williams, and they handcuffed defendant. Defendant told an officer, "I was protecting her because someone attacked her." Defendant asked Williams not to press charges. While one officer filled out paperwork and the other spoke with Williams in another room, defendant tried to dive head-first through a second story window. In 1999, defendant was convicted of felony false imprisonment by violence against Williams as well as infliction of corporal injury on a spouse or cohabitant.

In 2004, defendant was convicted of false imprisonment by violence against Gail Seaton. No facts of that offense were introduced at trial.

## J.     *Verdicts and Sentencing*

The jury was instructed on three theories of first degree murder: premeditation and deliberation, torture, and lying in wait. The jury was also instructed on second

degree murder. In addition, the jury was instructed on self defense and defense against harm within the home.

The jury convicted defendant of first degree murder (§ 187, subd. (a)) and found true an allegation that he personally used a deadly or dangerous weapon in the commission of that offense (§ 12022, subd. (b)(1)). The trial court sentenced defendant to a prison term of 25 years to life for the murder, consecutive to a one-year term for the weapon use allegation.

## III. DISCUSSION

### A. *Sufficiency of the Evidence*

Defendant contends there was insufficient evidence to support the jury's first degree murder verdict. He argues the prosecution failed to meet its burden to prove that defendant did not act in self defense, and he contends there was insufficient evidence that he committed the murder with premeditation and deliberation, by torture, or by lying in wait.

"The law we apply in assessing a claim of sufficiency of the evidence is well established: ' " ' "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " ' [Citation.] . . . 'We presume " 'in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.]" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 294.)

#### 1. Self-Defense

A person has the right to use "all force necessary" in self-defense if, based on the "nature of the attack," a reasonable person would be "justified in believing that his [or her] assailant intends to commit a felony upon him [or her]." (*People v. Clark* (1982)

11

130 Cal.App.3d 371, 377 (*Clark*), overruled on other grounds by *People v. Blakeley* (2000) 23 Cal.4th 82, 92.) When an intruder "unlawfully and forcibly enter[s]" a residence, there is "a rebuttable presumption that [the resident] was in reasonable fear of imminent danger when he [or she] used deadly force within his [or her] residence." (*People v. Brown* (1992) 6 Cal.App.4th 1489, 1496.)

However, "a person may use only that force which is necessary in view of the nature of the attack; any use of excessive force is not justified and a homicide which results therefrom is unlawful. [Citation.]" (*Clark, supra,* 130 Cal.App.3d at p. 377.) "[A] person may be found guilty of unlawful homicide even where the evidence establishes the right of self-defense if the jury finds that the nature of the attack did not justify the resort to deadly force or that the force used exceeded that which was reasonably necessary to repel the attack." (*Id.* at p. 380.)

"When the issue of self-defense is properly presented in a homicide case, the prosecution must prove the absence of the justification beyond a reasonable doubt. [Citation.]" (*People v. Pineiro* (1982) 129 Cal.App.3d 915, 920.) "Issues arising out of self-defense, including whether the circumstances would cause a reasonable person to perceive the necessity of defense, whether the defendant actually acted out of defense of himself [or herself], and whether the force used was excessive, are normally questions of fact for the trier of fact to resolve. [Citations.]" (*Clark, supra,* 130 Cal.App.3d at p. 378.) However, a reviewing court may conclude that the prosecution failed to carry its burden to prove that a homicide was not justified if the evidence of adequate provocation or self-defense is " 'both uncontradicted and sufficient as a matter of law.' " (*Ibid.*) The issue is a question for the trier of fact "where some of the evidence tends to show a situation in which a killing may not be justified" or where "the evidence is uncontroverted, but reasonable persons could differ on whether the resort to force was justified or whether the force resorted to was excessive." (*Id.* at p. 379.)

Here, defendant contends the prosecution did not present sufficient evidence from which the jury could have concluded that defendant did not act in self-defense when he killed Patterson. In other words, defendant contends that the evidence established he acted in self-defense as a matter of law. Defendant points out that there was evidence Patterson harbored "ill-will and animosity" towards him, that there was no evidence defendant had invited Patterson to his home, that the altercation apparently began in defendant's bedroom, and that defendant subsequently claimed that Patterson had come at him with a knife.

The question of whether defendant was entitled to use deadly force was a question for the jury because at least some of the evidence tended to show that the homicide was not justified and that "the force resorted to was excessive." (*Clark, supra,* 130 Cal.App.3d at p. 379.) The evidence showed that the violent altercation began in the bedroom, but the evidence did not necessarily support the defense theory that defendant had been sleeping or was taken by surprise by Patterson. Patterson—not defendant—was the major source of the blood in the bedroom, where a lot of blood was lost. The evidence indicated that defendant suffered the injuries to his hands later, in the kitchen, where there was a mixture of defendant's blood and Patterson's blood. Patterson's DNA was on the knife blade, and defendant's DNA was on the knife handle. Thus, the jury could reasonably conclude that defendant had the knife from the very beginning of the altercation and that he initiated the use of force. The evidence of the two sets of bloody handprints coming from the bedroom strongly indicated—in light of the DNA evidence—that Patterson crawled out of the bedroom, while defendant walked out, and that Patterson suffered additional injuries in the kitchen, including the injury to his head, which likely caused the high blood spatter in the kitchen and possibly caused the knife blade to break. The evidence established that Patterson was stabbed more than 30 times, all over his body. The presence of Patterson's cell phone on the bedroom floor, with Patterson's blood on it, suggested that Patterson may have tried to call 9-1-1 when he was

13

still in the bedroom, prior to the additional stab wounds he suffered in the kitchen.  Based on this evidence, the jury could reasonably conclude that defendant continued to stab Patterson at a time when Patterson was not a reasonable threat to defendant—i.e., that even if Patterson initiated the altercation, defendant used force in excess of "that which was reasonably necessary to repel the attack." (*Id.* at p. 380.)

Other evidence supported the jury's finding that defendant did not act in self-defense.  Defendant's neighbors heard cries for help, and the jury could reasonably find that those cries came from Patterson, in light of the severity of his injuries in comparison to those suffered by defendant, who was able to walk out of the house and drive away.  Additionally, when defendant saw his neighbors, he did not say that he had been attacked.  Instead, defendant claimed that Patterson was "all right" and "okay," and he fled without calling the police.

On this record, a reasonable jury could have found beyond a reasonable doubt that defendant's use of deadly force was not justified.  Substantial evidence supports the jury's finding that the homicide was not justified.

### 2. Premeditation and Deliberation

Defendant contends the evidence was insufficient to support a finding of premeditated and deliberate murder.  His argument is based on *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), in which the court set forth three categories of evidence commonly present in cases of premeditated and deliberate murder:  (1) planning activity, (2) preexisting motive and (3) manner of killing.[3] (*Id.* at pp. 26-27.)

---

[3] The *Anderson* factors are not exclusive or exhaustive.  "The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations.  It did not refashion the elements of first degree murder or alter the substantive law of murder in any way." (*People v. Thomas* (1992) 2 Cal.4th 489, 517.)

14

Defendant first contends there was no evidence showing that he planned to attack or kill Patterson. According to defendant, there was no evidence that defendant "lured" Patterson to defendant's house or to his bedroom and no evidence that defendant brought the knife to his bedroom before the violent altercation began. Defendant also argues that any inference of premeditation was negated by the fact that Patterson was still alive when defendant left.

On this record, the jury could have reasonably concluded that defendant planned a knife attack on Patterson. There was no evidence that Patterson forced his way into defendant's home. Patterson parked and locked his car in defendant's driveway in a manner suggesting he believed he was welcome at the residence. The blood spatter and DNA evidence supported a finding that defendant was the initial assailant, first stabbing Patterson with a knife in the bedroom, then following him through the hallway, and continuing to stab him in the kitchen until the knife broke when it hit Patterson's skull. Based on these facts, the jury could have determined that the "most reasonable inference[s]" were that defendant either invited Patterson over as part of a plan to kill him or that defendant formed the plan to kill Patterson after allowing Patterson to enter the residence. (See *People v. Perez* (1992) 2 Cal.4th 1117, 1127.) Further, after the stabbing, defendant tried to convince his neighbors that Patterson was fine, and he fled; he did not seem "horrified and distraught about what he had done," but rather like "someone who had just fulfilled a preconceived plan." (*People v. Boatman* (2013) 221 Cal.App.4th 1253, 1267 (*Boatman*).)

Defendant next contends there was no evidence of motive. He relies to a large extent on *Boatman, supra,* 221 Cal.App.4th 1253, in which the defendant shot his girlfriend in the face. The *Boatman* court found no evidence of motive from the victim's text messages to a friend, which suggested the defendant was angry, nor from a loud argument that began about three minutes before the shooting. (*Id.* at pp. 1258-1259, 1267-1268.) Defendant points out that according to the *Boatman* court, motive satisfies

15

the *Anderson* test if it is "the kind of motive that 'would in turn support an inference that the killing was the result of "a pre-existing reflection" and "careful thought and weighing of considerations" *rather than* "mere unconsidered or rash impulse hastily executed." ' [Citation.]" (*Id.* at p. 1268.)

Here, the evidence of motive was much stronger than in *Boatman*. In contrast to *Boatman*, the evidence here showed that defendant and Patterson had "long-term issues," and that they had been arguing for weeks prior to the homicide, not merely for a few minutes beforehand. Over a month before the homicide, defendant said that he "could kill" Patterson. This evidence supported an inference that the homicide " 'was the result of "a pre-existing reflection" and "careful thought and weighing of considerations" *rather than* "mere unconsidered or rash impulse hastily executed." ' [Citation.]" (*Boatman, supra,* 221 Cal.App.4th at p. 1268.)

Last, defendant contends the "manner of killing" evidence did not support a finding that the murder was premeditated. Defendant contrasts the stabbing here with the "execution-style murder" in *People v. Hawkins* (1995) 10 Cal.4th 920, 956 (overruled on other grounds by *People v. Lasko* (2000) 23 Cal.4th 101), where the victim was shot at close range in the back of the head and neck, and with cases where the defendant stabbed the victim in the chest, where "crucial organs" are located. Defendant points out that the stab wounds suffered by Patterson were not to critical organs and that they were spread all over his body.

The evidence here strongly suggested that defendant surprised Patterson with the knife attack, indicating he premeditated the assault. Defendant's blood was not found in the bedroom, where the assault began, and the upper hand prints in the hallway were not made by someone whose hands were bleeding. By contrast, Patterson lost a significant amount of blood in the bedroom, and his hands were apparently bleeding as he crawled through the hallway. This evidence indicates that defendant suffered no defensive wounds initially, and thus indicates that he brought the knife into the bedroom and took

16

advantage of an opportunity to attack an unsuspecting victim. In addition, most of the stab wounds were very deep—many were three inches or more, which showed that defendant acted in a manner consistent with the premeditated decision to kill Patterson. The fact that Patterson's wounds were not to vital organs does not detract from the strength of this evidence. The blood in the hallway indicated that Patterson's hands were among the first body parts injured, suggesting he put his hands up to keep defendant from stabbing more serious body parts. Further, "[t]he attack occurred in a series of rooms, indicating that [Patterson's] repeated attempts to break away . . . were consistently thwarted by [defendant's] relentless pursuit of him, even after he was gravely wounded." (*People v. Sanchez* (1995) 12 Cal.4th 1, 34 [manner of killing tended to demonstrate the defendant acted with premeditation and deliberation], disapproved on another ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 (*Doolin*).) And finally, defendant eventually did stab Patterson in a major artery as well as in the back of the head. These facts supported a finding that defendant "must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way." (*Anderson, supra,* 70 Cal.2d at p. 27.)

Because the evidence was sufficient to support a conviction of first degree premeditated murder, we need not consider whether it also supported a conviction under a torture-murder theory or a lying-in-wait theory. Any deficiency in the evidence of alternative first degree murder theories is harmless "absent an affirmative indication in the record that the verdict actually did rest" on one of those theories. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129 [where case is given to jury on different factual theories, one of which is not supported by the evidence, court presumes the jurors rejected that theory and based the verdict on the factually supported theory].) The record here does not affirmatively indicate the jury relied on torture or lying in wait rather than premeditation as a basis for first degree murder.

## B.    *Discharge of Juror No. 11*

Defendant contends the trial court erred by discharging Juror No. 11 for misconduct.  He contends the error violated his constitutional rights to a jury trial and to due process.

### 1.    **Proceedings Below**

The jury retired to deliberate about an hour before the lunch break on August 8, 2013.[4]  That afternoon, the prosecutor told the court that he had received a call from another deputy district attorney named Kevin Smith shortly after noon.  Smith had overheard someone who matched the description of Juror No. 11 talking on his cell phone.  The prosecutor represented that Smith would tell the court what he had heard.

The trial court asked defendant's trial counsel if he wanted Smith to be sworn in.  Defendant's trial counsel responded in the negative, noting that Smith was "an officer of the court" who was expected to tell the truth.

Smith then addressed the court.  He had been outside the county building at noon, waiting for some friends.  He heard a male voice say, "not guilty," and he looked up to see the person.  The person then said, "And I'll probably be the only not guilty after lunch too."  The person then walked away.

Neither the prosecutor nor defendant's trial counsel had any questions for Smith.  The trial court sent the bailiff into the jury room to ask Juror No. 11 to come to the courtroom and to instruct the other jurors to cease their deliberations.

The trial court addressed Juror No. 11, explaining that the juror had been overheard talking on his cell phone and discussing "the status of the deliberations in this case."  Juror No. 11 stated that he had been talking to his sister and that he had told her about "being in the jury deliberation," but that he had not gone "into detail."

---

[4] The clerk's minutes reflect that the deputy was sworn to take charge of the jury at 10:36 a.m., that the jury had begun deliberations by 10:44 a.m., and that the jury took the lunch break at 11:52 a.m.

The trial court told Juror No. 11 that according to Smith, Juror No. 11 had actually stated his position regarding whether defendant was guilty or not guilty with reference to the "position of the other jurors." Juror No. 11 replied, "I didn't – I didn't say which position I had. I said, you know, I haven't decided yet."

The trial court asked, "So, are you saying that you did not discuss your position with respect to whether or not you felt the defendant was guilty or not guilty in this case?" Juror No. 11 replied, "No, I did not." The trial court asked, "And it's also your position that you did not state how the other 11 jurors were leaning with respect to guilty or not guilty or conviction?" Juror No. 11 replied, "No. I just said – I told my sister, 'We are in deliberation, you know, through this day, possibly tomorrow.' " According to Juror No. 11, his sister asked how long deliberations would last, and he told her "that it might take a couple of days."

The trial court asked Juror No. 11 if he had said "the words 'not guilty' " during the conversation with his sister. Juror No. 11 said, "Yes." He had told his sister, "We are in jury deliberation now. We are going – we've got to prove if he's guilty or not guilty, and it's going to take some time, and everybody has got a chance to say what they believe, and it will be, you know, a period of deliberation."

The trial court asked Juror No. 11 if he had told his sister that he "might be the only not guilty vote after lunch." Juror No. 11 replied, "No, I didn't state anything in that manner. Again, I just, you know, I was explaining that we've got to decide if he's guilty or not guilty, and that, you know, we will be back into deliberation after lunch."

The trial court asked Juror No. 11 to step out and then asked Smith more questions. Smith confirmed that Juror No. 11 was the person he had overheard. The trial court asked if Smith could have misheard Juror No. 11's statements. Smith replied, "No. I heard him say 'not guilty' with no explanation after it. And then I heard, 'and after lunch, I'll probably be the only not guilty too.' " There was no question in Smith's mind regarding what he had heard.

19

The prosecutor asked the trial court to make a finding regarding Juror No. 11's credibility. The prosecutor argued that Smith was credible and that Juror No. 11 was not. The prosecutor also argued that Juror No. 11 had engaged in misconduct.

Defendant's trial counsel argued that Juror No. 11 had not discussed the details of the case and thus had not violated the admonition the jury had been given. Defendant's trial counsel asked the trial court to admonish Juror No. 11 instead of dismissing him.

In announcing its ruling, the trial court first addressed the issue of whether Juror No. 11 had committed misconduct. The trial court found it "clear" that Juror No. 11 had discussed the case with his sister in violation of the admonition the court had given pursuant to CALCRIM No. 3550.[5]

Regarding credibility, the trial court noted that Smith was a "veteran district attorney" who had tried at least three major cases before the trial court. Based on prior cases, the trial court felt that Smith had integrity and that he was ethical and believable. "So if Mr. Smith said he heard it, I know he heard it." The trial court found that Smith was "very credible."

On the other hand, Juror No. 11 was "clearly uncomfortable" when telling the trial court about his conversation. Juror No. 11 was "evasive" and gave different answers each time the trial court asked him questions. "[H]e was clearly not candid." The trial court found that juror No. 11 was "not credible."

The trial court found good cause to discharge Juror No. 11.

---

[5] CALCRIM No. 3550 was read to the jury just prior to deliberations. In pertinent part, the jury was instructed: "As I told you at the beginning of the trial, do not talk about the case or about any of the people or any subject involved in it with anyone, including, but not limited to, your spouse or other family, or friends, spiritual leaders or advisors, or therapists. You must discuss the case only in the jury room and only when all jurors are present. Do not discuss your deliberations with anyone. Do not communicate using blogs, Facebook, Twitter, Tumblr, or any other social media during your deliberations."

### 2.     Legal Standards

The trial court may discharge a juror at any time, upon "good cause shown to the court," if the juror "is found to be unable to perform his or her duty." (§ 1089; see *People v. Lomax* (2010) 49 Cal.4th 530, 588 (*Lomax*).)  Under section 1122, jurors must not "converse among themselves, or with anyone else, on any subject connected with the trial, or to form or express any opinion about the case until the cause is finally submitted to them." (*Id.*, subd. (b).)  The admonition against forming an opinion requires jurors to consider all the evidence and precludes jurors from ignoring "further evidence, argument, instructions, or the views of other jurors." (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 73.)  The admonition against discussing the case protects jurors from extraneous influence outside of the evidence and instructions.  (See *In re Carpenter* (1995) 9 Cal.4th 634, 653.)  "Violation of this duty is serious misconduct." (*In re Hitchings* (1993) 6 Cal.4th 97, 118.)

" 'In determining whether juror misconduct occurred, "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." ' [Citations.]" (*People v. Linton* (2013) 56 Cal.4th 1146, 1194 (*Linton*).)  The ultimate decision to discharge a juror is a matter within the trial court's discretion.  (*Lomax, supra,* 49 Cal.4th at p. 589.)  However, " 'a somewhat stronger showing' than is typical for abuse of discretion review must be made to support such decisions on appeal.  [Citation.]" (*Ibid.*)  "[T]he basis for a juror's disqualification must appear on the record as a 'demonstrable reality.'  This standard involves 'a more comprehensive and less deferential review' than simply determining whether any substantial evidence in the record supports the trial court's decision.  [Citation.]  It must appear 'that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias was established.'  [Citation.]  However, in applying the demonstrable reality test, we do not reweigh the evidence.  [Citation.]  The inquiry is

whether 'the trial court's conclusion is manifestly supported by evidence on which the court actually relied.' [Citation.]" (*Id.* at pp. 589-590, fn. omitted.)

Defendant contends there was no evidence that Juror No. 11 could not perform his duties. He contends the trial court was required to presume that all jurors would follow the instructions given to them and that the trial court should have believed Juror No. 11 rather than Smith. He contends the record does not provide a basis for the trial court's credibility determination. He contends Juror No. 11 was credible because the conversation occurred shortly after deliberations had begun, a time when the jurors were "highly unlikely" to have already disclosed their votes for guilt.

Substantial evidence supports the trial court's finding that Smith was credible. (See *Linton, supra,* 56 Cal.4th at p. 1194.) As defendant's trial counsel observed, Smith was an officer of the court who was expected to tell the truth. Smith was definitive and consistent when reporting on the conversation he had overheard, and he told the trial court there was no question in his mind about what he had heard. The trial court heard Smith's account of what he heard and thus was able to see Smith's demeanor first-hand.

Substantial evidence also supports the trial court's finding that Juror No. 11 was not credible. Juror No. 11 was vague and inconsistent when reporting on his statements to his sister. Juror No. 11 first told the trial court only that he had told his sister about "being in the jury deliberation." Upon prodding from the trial court, Juror No. 11 then added that he had also told his sister that he had not decided yet. Upon still further questioning, he admitted using the term "not guilty," but he denied stating a position. The trial court was able to observe Juror No. 11's demeanor in making these statements. With respect to defendant's claim that that the jurors were unlikely to have taken a vote at the beginning of deliberations, we observe that it is common for a jury to take a preliminary vote soon after they have retired to deliberate. (See, e.g., *People v. Mendoza* (2000) 24 Cal.4th 130, 194; *Vomaska v. City of San Diego* (1997) 55 Cal.App.4th 905, 909.)

22

On this record, the trial court could reasonably conclude that Juror No. 11 was less credible than Smith, and that Juror No. 11 had in fact violated his duty not to discuss the case or the deliberations with anyone. As the basis for Juror No. 11's disqualification appears on the record "as a 'demonstrable reality,' " the trial court did not abuse its discretion by dismissing that juror. (*Lomax, supra,* 49 Cal.4th at p. 589.)

### C. *Failure to Instruct on Voluntary Manslaughter*

Defendant contends the trial court erred by failing to instruct the jury, sua sponte, on voluntary manslaughter. The Attorney General contend that this claim was waived under the doctrine of invited error.

### 1. Proceedings Below

During the jury instruction conference, defendant's trial counsel explained that "an election was made to not include manslaughter as a lesser included." Defendant's trial counsel noted that he had met with defendant and defendant's family and that he had explained to them his "strategic reasons and factual reasons for not wanting to have a lesser included of either voluntary or involuntary manslaughter." Defendant's trial counsel acknowledged that defendant disagreed with that strategy, but defendant's trial counsel did not think that defendant would insist on a voluntary manslaughter instruction being given over counsel's advice.

Defendant's trial counsel conferred with defendant, then reported that defendant agreed that his "best interest is served by having the case go to the jury about a murder or not guilty by reason of self-defense, period. No manslaughter."

The trial court noted "that giving the manslaughter instruction as a lesser included offense is sua sponte to the court" and asked the prosecutor for his position. The prosecutor noted that the evidence supporting provocation was "essentially" the same as the evidence supporting self-defense, and that a finding of self-defense would "lead to a not guilty entirely as opposed to a partial victory of voluntary manslaughter." Thus, the

23

prosecutor agreed that it was "a sensible tactical choice" to forego voluntary manslaughter instructions.

The trial court asked defendant's trial counsel if he had discussed the matter with defendant on previous occasions. Defendant's trial counsel explained that he had discussed the "ramifications" of the strategy with defendant previously as well as in court that day. Defendant's trial counsel reiterated that "from a strategic standpoint," he was choosing not to argue that provocation should reduce the homicide to voluntary manslaughter because he wanted the jury to find that Patterson's attack justified defendant committing the homicide in self-defense. Defendant's trial counsel also explained that arguing imperfect self-defense would "detract" from his self-defense argument.

The trial court agreed not to give the manslaughter instructions.

After the trial court instructed the jury, dismissed Juror No. 11, replaced Juror No. 11 with an alternate, and instructed the jury to begin deliberations anew, defendant's trial counsel reported that defendant was now requesting involuntary and voluntary manslaughter instructions. Defendant's trial counsel reiterated that he had discussed the issue with defendant on "numerous occasions," including an hour-long conversation before the jury was instructed. The trial court found that defendant's request was untimely.

### 2.    Analysis

" ' " 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. . . .' [Citation.] That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.] The obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only

24

fails to request the instruction but expressly objects to its being given." ' [Citations.]" (*People v. Souza* (2012) 54 Cal.4th 90, 114 (*Souza*), quoting *People v. Breverman* (1998) 19 Cal.4th 142, 154; see also *People v. Birks* (1998) 19 Cal.4th 108, 118.)

Nevertheless, a claim that the trial court failed to comply with its obligation to instruct on lesser-included offenses "may be waived under the doctrine of invited error if trial counsel both ' "intentionally caused the trial court to err" ' and clearly did so for tactical reasons. [Citation.] Invited error will be found, however, only if counsel expresses a deliberate tactical purpose in resisting or acceding to the complained-of instruction. [Citations.]" (*Souza, supra,* 54 Cal.4th at p. 114.) " 'The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his [or her] behest.' " (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49.) Thus, "a defendant may not invoke a trial court's failure to instruct on a lesser included offense as a basis on which to reverse a conviction when, for tactical reasons, the defendant persuades a trial court not to instruct on a lesser included offense supported by the evidence. [Citations.]" (*People v. Barton* (1995) 12 Cal.4th 186, 198.)

An example of how the invited error doctrine applies to a trial court's failure to instruct on a lesser included offense is provided by *People v. Cooper* (1991) 53 Cal.3d 771 (*Cooper*). In that case, the defendant was charged with several counts of first degree murder, but the trial court indicated it was considering giving instructions on second degree murder as well. (*Id.* at p. 825.) The defendant's trial counsel objected to the second degree murder instructions, repeatedly stating that he did not want the jury to reach a compromise verdict. (*Id.* at p. 826.) The defendant's trial counsel indicated he had obtained the defendant's agreement with respect to that decision, and the defendant confirmed he did agree. (*Ibid.*)

On appeal, the *Cooper* defendant argued that the trial court had erred by failing to instruct on second degree murder, but the California Supreme Court held that "any error

25

was invited" because the record showed that "[d]efense counsel had a deliberate tactical purpose for his objection." (*Cooper, supra,* 53 Cal.3d at p. 827.) The record showed that the defendant's trial counsel "believed it was in his client's interest not to have the second degree murder instructions" and that counsel was aware that without an objection, the trial court would have given the lesser included offense instruction. (*Id.* at p. 831.) The court also noted that the defendant's "personal waiver" was not required for application of the invited error doctrine. (*Id.* at p. 827) Rather, "the action of 'counsel' " is "the critical factor." (*Ibid.*)

In this case, the record similarly shows that defendant's trial counsel made a deliberate, tactical choice to refuse manslaughter instructions. As in *Cooper,* defendant's trial counsel made it clear he did not want the jury to have a basis upon which it could reach a compromise verdict. Defendant's trial counsel believed it was in defendant's best interest to pursue such a strategy, and he understood that the trial court would have given manslaughter instructions but for his objection. Under the circumstances, the invited error doctrine applies. Even though defendant himself later changed his mind, "the action of 'counsel' " is "the critical factor" with respect to application of the invited error doctrine. (*Cooper, supra,* 53 Cal.3d at p. 827.)

### D. Self-Defense Instruction

Defendant contends the trial court erred by including the word "and" instead of the word "or" when instructing the jury pursuant to CALCRIM No. 506, which is entitled "Justifiable Homicide: Defending Against Harm to Person Within Home or on Property."

#### 1. Instruction

The trial court instructed the jury pursuant to CALCRIM No. 506 as follows: "The defendant is not guilty of murder if he killed to defend himself in the defendant's home. Such a killing is justified, and therefore not unlawful, if: [¶] One, the defendant reasonably believed that he was defending his home against Ricky Patterson who intended to or tried to commit the crime of assault with a deadly weapon *and* tried to

26

enter or did enter that home intending to commit an act of violence against someone inside; [¶] Two, the defendant reasonably believed that the danger was imminent; [¶] Three, the defendant reasonably believed that the use of deadly force was necessary to defend against the danger; [¶] and [¶] Four, the defendant used no more force than was reasonably necessary to defend against the danger. [¶] Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of violence to himself. Defendant's belief must have been reasonable and he must have acted only because of that belief. The defendant is only entitled to use the amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, then the killing was not justified. [¶] When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed. [¶] A defendant is not required to retreat. He is entitled to stand his ground and defend himself and, if reasonably necessary, to pursue an assailant until the danger of death or bodily injury has passed. This is so even if safety can [be] achieved by retreating. [¶] The People have the burden of proving beyond a reasonable doubt that the killing was not justified. If the People have not met this burden, you must find the defendant not guilty of murder." (Emphasis added.)

### 2. Analysis

The defense described in CALCRIM No. 506 is based on section 197, subdivision (2), which provides that a homicide is justifiable "[w]hen committed in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony, *or* against one who manifestly intends and endeavors, in a violent, riotous or tumultuous manner, to enter the habitation

27

of another for the purpose of offering violence to any person therein." (Emphasis added.) In contrast to the instruction given here, the standard version of CALCRIM No. 506 contains the word "or" where the word "and" appears in italics in the quoted instruction above.[6]

The Attorney General concedes and we agree that the trial court here erred by replacing the word "or" with the word "and" in the first element of CALCRIM No. 506. Thus, the question is whether the error requires reversal.

We will assume that a court's misinstruction on an element of a defense is akin to a court's misinstruction on an element of an offense, which is subject to harmless error review under the beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). (See *People v. Flood* (1998) 18 Cal.4th 470, 502-503.) Under this standard, the error is harmless only if we can declare "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman, supra,* at p. 24.) "To say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." (*Yates v. Evatt* (1991) 500 U.S. 391, 403 (*Yates*) disapproved on another ground by *Estelle v. McGuire* (1991) 502 U.S. 62, 73, fn. 4.)

As given, the instruction required the jury to find that Patterson both (1) "intended to or tried to commit the crime of assault with a deadly weapon" and (2) "tried to enter or did enter that home intending to commit an act of violence against someone inside." The instruction should have required the jury to find only one of these two facts. On this record, however, the error was harmless beyond a reasonable doubt. The defense theory was that Patterson went to defendant's residence with the intent to commit an act of violence against him, and then proceeded to assault defendant with the knife while

---

[6] The written version of CALCRIM No. 506 provided to the jury also contained the word "and" instead of the word "or."

defendant was in his bed. Defendant's trial counsel never argued that Patterson formed the intent to commit an act of violence against defendant after entering the residence. If the jury believed the defense theory that Patterson assaulted defendant with a knife while defendant was in bed, it would have found that Patterson both "intended to or tried to commit the crime of assault with a deadly weapon" *and* "tried to enter or did enter that home intending to commit an act of violence against someone inside." Because the defense theory relied on the existence of both facts, the instructional error was "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." (*Yates, supra,* 500 U.S. at p. 403.)

Moreover, the defense of section 197, subdivision (2) as defined in CALCRIM No. 506 required the jury to find that defendant "used no more force than was reasonably necessary to defend against the danger." The evidence overwhelmingly established that defendant used more force than necessary, even if Patterson did initiate the assault by coming towards defendant with a knife. The incident began in the bedroom, where only Patterson's blood was found. This evidence established that defendant either initiated the assault with the knife or quickly disarmed Patterson of the knife. Further, Patterson was stabbed more than 30 times, including a likely final blow to the back of the head that was hard enough to break the knife. Many of Patterson's wounds were inflicted in the kitchen, after he was so wounded he could only crawl out of the bedroom. On this record, no reasonable juror would find that defendant "used no more force than was reasonably necessary to defend against the danger." Thus, beyond a reasonable doubt, the instructional error with respect to Patterson's intent and entry "did not contribute to the verdict obtained." (*Chapman, supra,* 386 U.S. at p. 24.)

### E.     *Prosecutorial Misconduct*

Defendant contends the prosecutor committed misconduct during closing argument by (1) misstating the law of self-defense within the home, (2) appealing to the

sympathy of the jurors, (3) injecting his personal opinion of the evidence into the trial, and (4) attacking defense counsel.

The general rules applying to claims of prosecutorial misconduct are as follows: "Under the federal Constitution, to be reversible, a prosecutor's improper comments must ' "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citations.] ' "But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " [Citations.]' [Citation.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1000.) When the claim of prosecutorial misconduct "is based upon 'comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]' [Citations.]" (*Id.* at p. 1001.)

"A defendant generally ' " 'may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]' " [Citation.]' [Citation.] A defendant's failure to object and to request an admonition is excused only when 'an objection would have been futile or an admonition ineffective.' [Citation.]" (*People v. Fuiava* (2012) 53 Cal.4th 622, 679 (*Fuiava*).)

Here, defendant's claims of prosecutorial misconduct all involve prosecutorial argument to which his trial counsel failed to object. As to some of the claims, he asserts that an objection would have been futile, and he argues that his trial counsel was ineffective for failing to object in each instance.

### 1. Alleged Misstatement of Law

Defendant first contends that the prosecutor misstated the law of self-defense within the home by stating that the defense applied only if the jury found that Patterson

broke into defendant's residence "with murder on his mind." Defendant points out that the instructions and law required the jury to find that Patterson intended to assault defendant, not murder him.

The challenged comment was made in the context of the prosecutor's discussion of the presumption set forth in section 198.5: that a person held "a reasonable fear of imminent peril of death or great bodily injury" if he or she used "force intended or likely to cause death or great bodily injury within his or her residence" against a person who "unlawfully and forcibly entered" the residence. The prosecutor told the jurors, "[Y]ou don't need [that presumption]. If you find that Ricky Patterson broke into that house with murder on his mind, send [defendant] home. That's not what happened."

"[I]t is misconduct for the prosecutor to misstate the applicable law [citation]." (*People v. Boyette* (2002) 29 Cal.4th 381, 435.) Here, the prosecutor's comment did not state that the jury could find defendant acted in self-defense within his home only if Patterson broke in with "murder on his mind." In context, the prosecutor was telling the jury that it did not need to even consider whether the section 198.5 presumption applied if Patterson was thinking of killing defendant when he entered defendant's residence.

Even assuming the prosecutor misstated the law, an objection would not have been futile and an admonition would have been effective. (See *Fuiava, supra,* 53 Cal.4th at p. 679.) Defendant's trial counsel could have requested the trial court tell the jury the correct legal standard. However, defendant's trial counsel was not ineffective for failing to object and request an admonition. "[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance. [Citations.]" (*People v. Maury* (2003) 30 Cal.4th 342, 419.) The record indicates defendant's trial counsel made a tactical decision to respond to the prosecutor's comments by reading the jury the requirements for CALCRIM No. 506 during his own argument. (See *People v. Welch* (1999) 20 Cal.4th 701, 764 (*Welch*).) This decision was reasonable, particularly since the jury was also instructed to follow the trial court's instructions on the law and that if

31

"the attorneys' comments on the law conflict with [the] instructions, you must follow [the] instructions." (See CALCRIM No. 200.)

### 2. Alleged Appeals to Jurors' Sympathy

Defendant next contends the prosecutor improperly appealed to the sympathy of the jurors by (1) asking the jurors to consider what they would think if "someone did this to a dog or cat" and saying that only a "sadistic evil person" would do such a thing; (2) referring to self-defense as a "license to kill;" and (3) repeatedly reminding the jury how much defendant's expert (Dr. Melinek) was being paid.

"A prosecutor may 'vigorously argue his [or her] case and is not limited to "Chesterfieldian politeness" ' [citation], and he [or she] may 'use appropriate epithets warranted by the evidence.' [Citations.]" (*People v. Fosselman* (1983) 33 Cal.3d 572, 580.) When a defendant claims that a prosecutor made outrageous or prejudicial comments, we "view the statements in the context of the argument as a whole. [Citation.]" (*People v. San Nicolas* (2004) 34 Cal.4th 614, 665-666.)

#### a. References to Animals and Use of Term "Sadistic"

The prosecutor's comments about animals came in the context of his argument about first degree murder by torture. The prosecutor argued that the elements of torture-murder—including the requirement that the defendant "intended to inflict the pain for any sadistic reason"—were met. (See CALCRIM No. 733; *People v. Jennings* (2010) 50 Cal.4th 616, 676, fn. 28.) The prosecutor stated, "Just look at what happened to Mr. Patterson and ask yourself this question: Is it anything but sadistic to do this to your friend? Or any other person? [¶] You know, sometimes I think we, in the [B]ay [A]rea, a lot of us are animal lovers. Imagine what you might think if someone did this to a dog or a cat. Who would think for one millisecond that that was anything but a sadistic, evil person? [¶] Ricky Patterson is a human being. Of course it's sadistic."

The above argument did not amount to an improper appeal to the jury's sympathies. The prosecutor did not argue that defendant had inflicted animal abuse; he

32

argued that defendant had inflicted pain on Patterson, a human being. Further, the term "sadistic" was in the jury instruction on torture-murder. (See CALCRIM No. 733.) Moreover, even if the comments did cross the line of permissible argument, an objection and admonition would have cured the harm. (See *Fuiava, supra,* 53 Cal.4th at p. 679.) And finally, trial counsel was not ineffective for failing to object, as the record reveals he made a reasonable tactical decision to respond to the prosecutor's remarks in his own argument.[7] (See *Welch, supra,* 20 Cal.4th at p. 764.)

    b.   *Use of Phrase "License to Kill"*

The prosecutor used the term "license to kill" several times when discussing self-defense. The prosecutor equated "lawful self-defense" with "a right to kill someone" and a "license to kill." Even if the prosecutor's use of the phrase "license to kill" amounted to an improper attempt to persuade the jury, an objection and admonition would have cured any harm. (See *Fuiava, supra,* 53 Cal.4th at p. 679.) And on this record, trial counsel's failure to object appears to be the result of a tactical decision. During his own argument to the jury, defendant's trial counsel discussed each element of self-defense as provided by CALCRIM No. 505. Defendant's trial counsel appears to have determined that it would be more effective to respond to the prosecutor's argument by focusing on the facts and the wording of the self-defense instruction. (See *Welch, supra,* 20 Cal.4th at p. 764.) This was a reasonable tactical decision, particularly since the jury was told to follow the trial court's instructions rather than the arguments of counsel. (See CALCRIM No. 200.)

---

[7] Defendant's trial counsel argued that the prosecutor "tried to appeal to your emotions by comparing to what happened to [Patterson] to your feelings if the knife wounds had been used on a dog or a cat in the hope that you would consider [Patterson] in the same way you would feel for a dog or a cat. A dog and a cat are defenseless animals. They love people, by and large. They don't carry knives. They don't sneak into a house trying to kill you. Why would he use that example? Just to pull at your heart strings, to hope that you will make an emotional decision rather than one based on facts."

### c. *Comments About Defense Expert*

When cross-examining Dr. Melinek, the prosecutor elicited the fact that she had put in about 10 hours of work on defendant's case and the fact that she charged $600 per hour. During argument to the jury, the prosecutor referred to Dr. Melinek's "$6,000 worth of testimony." The prosecutor noted that he had not asked Dr. Melinek "how much more she would make over that lunch hour" and that she would make $864,000 a year by working only 30 hours per week for 40 weeks out of the year. The prosecutor also noted that her "over $6,000 of testimony" had informed the jury that "sometimes people run out of fear from future consequence," and he commented, "As if we needed a $600-an-hour expert to tell us that." The prosecutor later argued that Dr. Melinek had an "incentive" to give testimony that was helpful to the defense because she was getting "paid $600 an hour."

"[T]he prosecutor has considerable leeway in suggesting an expert may testify a certain way for financial gain or other reasons, without committing misconduct. [Citation.]" (*People v. Salcido* (2008) 44 Cal.4th 93, 154 (*Salcido*).) Here, an objection and admonition would have cured any harm (see *Fuiava, supra,* 53 Cal.4th at p. 679), and trial counsel's failure to object appears to be the result of a tactical decision to respond during his own argument, rather than due to ineffective assistance.[8] (See *Welch, supra,* 20 Cal.4th at p. 764.)

---

[8] Defendant's trial counsel responded to the prosecutor's comments as follows: "I'm not going to dignify [the prosecutor's] attack on Doctor Melinek's compensation. That was paid to her by the county. Those fees were paid only after [the presiding judge] was satisfied that the fees were reasonable and proper. To suggest that she earns $840,000 a year and, therefore, for some reason you should disregard her testimony is absurd."

### 3. Alleged Injection of Personal Opinion

Defendant next contends the prosecutor improperly injected his personal opinion of the evidence into the trial. Defendant identifies six comments as objectionable on this basis.

" '[A] prosecutor may not . . . vouch personally for the appropriateness of the verdict he or she urges.' [Citation.]" (*People v. Ayala* (2000) 24 Cal.4th 243, 288.) "A prosecutor is [also] prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record. [Citaitons.]" (*People v. Frye* (1998) 18 Cal.4th 894, 971, disapproved on another ground by *Doolin, supra,* 45 Cal.4th at p. 421, fn. 22.)

First, defendant criticizes the prosecutor for telling the jury, "I can't think of a more idiotic, stupid way to go over to your friend's house with an intent to injure or kill him than to do it in your own truck, lock the doors so you can't make a speedy getaway . . . ." Second, he criticizes the prosecutor for saying, "I think probably the thing that illustrates the lack of Mr. Patterson's intent [to harm defendant]" is that "the phone was on the speaker." As to both of these comments, the gist of defendant's criticism is the prosecutor's use of the pronoun "I." However, "[s]uch phraseology hardly establishes impermissible expression of personal belief in the defendant's guilt. [Citation.] Examination of the prosecutor's closing argument demonstrates that he was merely presenting his views of the deductions and inferences warranted by the evidence. [Citation.]" (*People v. Allison* (1989) 48 Cal.3d 879, 894 (*Allison*).)

The third challenged comment was made when the prosecutor discussed the length of time that defendant's trial counsel spent cross-examining Phan, one of the two neighbors who testified. The prosecutor told the jury, "I honestly can't explain why [defense] counsel took so much time with Miss Phan when it's corroborated by Mr. Brilliantes' testimony." While " '[p]ersonal attacks on opposing counsel are improper and irrelevant to the issues,' " in this instance " '[t]he prosecutor did not engage in such

forbidden tactics as accusing defense counsel of fabricating a defense or factually deceiving the jury.' " (*People v. Friend* (2009) 47 Cal.4th 1, 31 (*Friend*).)  In context, a reasonable jury would have understood the prosecutor to be arguing about the strength of the evidence.

The fourth challenged comment was made when the prosecutor was discussing Dr. Melinek's testimony.  The prosecutor noted that he had asked Dr. Melinek whether credible experts have legitimate differences of opinion and that Dr. Melinek had agreed. The prosecutor then stated, "What Doctor Melinek needs to add to that statement is: experts who are paid $600 an hour to wait in the hallway to tell you people run out of fear.[]  Okay.  I agree."  By expressing his personal agreement with Dr. Melinek's testimony that "people run out of fear," the prosecutor did not overstep the bounds of permissible argument.  As noted above, "[t]he prosecutor has considerable leeway" in discussing the testimony of a defense expert (*Salcido, supra,* 44 Cal.4th at p. 154) and in context, the prosecutor's reference to his agreement with Dr. Melinek did not amount to an impermissible expression of personal belief in defendant's guilt.  (See *Allison, supra,* 48 Cal.3d at p. 894.)

The final two challenged comments occurred during the prosecutor's closing argument.  The prosecutor noted that although the defense had called Deputy Valadez, defendant's trial counsel had criticized parts of his testimony.  The prosecutor stated, "I just don't understand [that]."  Later, the prosecutor referred to a statement by defendant's trial counsel that his job was not to tell the jury "what the facts are," but "to give you possibilities, to give you a perspective, to ask you to look carefully at what the evidence was in this case . . . ."  The prosecutor told the jury, "I agree.  Counsel's here to come up with possibilities, not reasonable doubt."  Neither of the these comments was improper; the prosecutor did not express a personal belief in defendant's guilt, imply there were additional facts not in evidence, vouch for the credibility of a witness, or make a personal attack on defendant's trial counsel.

36

## 4. Alleged Attacks on Defendant's Trial Counsel

Finally, defendant contends the prosecutor improperly attacked defendant's trial counsel during argument by stating that the job of defendant's trial counsel was "just to point out possibilities, whether they are reasonable or not" and "to come up with possibilities, not reasonable doubt." As noted above, these comments were made in response to statements made by defendant's trial counsel, who had previously told the jury, "My job is to give you possibilities, to give you a perspective, to ask you to look carefully at what the evidence was in this case . . . ." The prosecutor's responsive comments did not amount to improper " '[p]ersonal attacks on opposing counsel' " or " 'such forbidden tactics as accusing defense counsel of fabricating a defense or factually deceiving the jury.' " (*Friend, supra,* 47 Cal.4th at p. 31.)

### F. *Ineffective Assistance of Counsel*

Defendant contends his trial counsel was ineffective for (1) requesting the jury not be instructed on manslaughter, (2) failing to object to the erroneous instruction on self-defense within the home, and (3) failing to object to the above-identified instances of prosecutorial misconduct.

" 'In order to establish a clim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it "fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms." [Citations.] Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." [Citation.] If the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." [Citations.] If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must

show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [Citation.]' [Citation.]" (*People v. Lopez* (2008) 42 Cal.4th 960, 966 (*Lopez*); see *Strickland v. Washington* (1984) 466 U.S. 668, 690, 694.)

### 1. Refusal of Manslaughter Instructions

Defendant first contends his trial counsel was ineffective for requesting the jury not be instructed on manslaughter. We have previously concluded that to the extent the trial court had a sua sponte duty to give manslaughter instructions, any error in failing to so instruct was invited by defendant's trial counsel.

The decision to forego manslaughter instructions in this case, in order to avoid a compromise verdict, was a reasonable tactical decision "in light of the evidence." (*Cooper, supra,* 53 Cal.3d at p. 832.) Most significantly, after his fall or jump from the overpass, defendant stated, "He had a knife. He came at me." Trial counsel could reasonably determine that this statement was consistent with a self-defense verdict but inconsistent with a manslaughter verdict. That is, if the jury had believed defendant's statement, it would necessarily have believed that defendant did not kill Patterson in a sudden quarrel or heat of passion or due to an unreasonable belief in the need to defend himself. (See *People v. Manriquez* (2005) 37 Cal.4th 547, 583 ["an intentional killing is reduced to voluntary manslaughter if . . . the defendant acts upon a sudden quarrel or heat of passion on sufficient provocation . . . , or kills in the unreasonable, but good faith, belief that deadly force is necessary in self-defense"].) To have argued for a manslaughter verdict might have "undercut the credibility of the defense." (*Cooper, supra,* 53 Cal.3d at p. 832.) As defendant's trial counsel's actions " ' "can be explained as a matter of sound trial strategy," ' " we conclude that " ' "counsel's performance fell within the wide range of professional competence" ' " and that defendant did not receive ineffective assistance of counsel when his trial counsel requested that the trial court not give manslaughter instructions. (*Lopez, supra,* 42 Cal.4th at p. 966.)

38

### 2. Failure to Object to Wording of CALCRIM No. 506

Defendant next contends his trial counsel was ineffective for failing to object to the erroneous instruction on self-defense within the home. We have previously concluded that the erroneous instruction was harmless beyond a reasonable doubt. (*Chapman, supra,* 386 U.S. at p. 24.) As there was no prejudice from that instruction, defendant's trial counsel was not ineffective for failing to object.

### 3. Failure to Object to Prosecutorial Misconduct

Finally, defendant contends his trial counsel was ineffective for failing to object to the prosecutor's comments that defendant alleges to have constituted prosecutorial misconduct. As to each instance, we have previously concluded there was no prosecutorial misconduct or that defendant's trial counsel was not ineffective for failing to object.

## G. *Admission of Evidence Relating to McClendon*

Defendant contends the trial court erred by allowing the prosecution to introduce evidence concerning defendant's relationship with his ex-girlfriend, McClendon. That evidence included defendant's behavior on May 2, 2011 (when he blocked McClendon's car, exhibited "erratic" behavior, and threatened to kill himself), the fact that McClendon obtained a restraining order, and the evidence of defendant's various Google searches.

### 1. Proceedings Below

During trial, defendant objected "as to its relevance" regarding the admission of testimony about the incident involving McClendon. The prosecutor argued that the evidence was relevant to defendant's mental state around the time of the offense. The trial court found that the proposed testimony would be "highly relevant" and that it was admissible.

Following McClendon's testimony, the prosecutor noted that pursuant to a discussion with defendant's trial counsel, the prosecutor had purposely avoided asking

39

McClendon questions that would have elicited that defendant had made "some threats [of] violence."

During argument to the jury, the prosecutor told the jury that in order to understand what defendant did, "you have to understand what's going on in the defendant's mind." The prosecutor referred to defendant's reaction to his recent breakup with McClendon and reminded the jury that defendant's "mind state at the time" included suicidal thoughts. The prosecutor argued that defendant's Google searches gave the jury "a window" into what defendant was thinking at the time and argued that the evidence showed that "[t]hings are spiral[]ing out of control to such a degree that he's contemplating suicide . . . ." The prosecutor also argued that some of defendant's Google searches showed him contemplating "doing things that aren't that different from what happened to Mr. Patterson." He reminded the jury that defendant had told McClendon, "I can't take too much or I'm going to snap," and he argued, "That's what happened on May 10th, 2011, at defendant's house. He snapped. He couldn't take it anymore, and he took someone with [him], his friend, Ricky Patterson . . . ."

### 2. Analysis

Defendant first contends the evidence relating to McClendon was not relevant to the issues at trial.

" 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "The test of relevance is whether the evidence tends ' "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. [Citations.]' [Citation.] The trial court has broad discretion in determining the relevance of evidence [citations], but lacks discretion to admit irrelevant evidence. [Citations.]" (*People v. Scheid* (1997) 16 Cal.4th 1, 13-14.)

40

As the prosecutor argued during trial, the evidence of defendant's reaction to the breakup with McClendon was relevant to his state of mind on the day of the stabbing. That evidence showed that defendant was experiencing intense feelings of frustration to the extent that he was contemplating suicide. These feelings provided a possible motive for defendant's commission of the charged offense. Thus, the trial court did not abuse its discretion by determining that the evidence was relevant.

Defendant next contends the evidence of his relationship with McClendon was improper character evidence under Evidence Code section 1101, subdivision (a). While Evidence Code section 1101, subdivision (a) prohibits the introduction of "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) . . . when offered to prove his or her conduct on a specified occasion," Evidence Code section 1101, subdivision (b) specifies that such evidence is admissible "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." As just discussed, the evidence showed that defendant was experiencing intense feelings of frustration, which provided a possible motive for his commission of the charged offense. This motive evidence was admissible under Evidence Code section 1101, subdivision (b).

Finally, defendant contends the probative value of the challenged evidence was substantially outweighed by its prejudicial effect. (See Evid. Code, § 352.) Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Prejudicial evidence means " 'evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues.' " (*People v. Bolin* (1998)

41

18 Cal.4th 297, 320.) " 'In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." ' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

The evidence concerning McClendon was not particularly inflammatory and thus was not the type of evidence that would tend to evoke an emotional bias against defendant. Defendant did not commit any actual physical violence against McClendon, whereas in the charged offense he committed a brutal stabbing. The Google searches showed defendant's frustration, but nothing about the searches was likely to inflame the jury or suggest defendant had a propensity to commit violent acts against others. The evidence was presented without consuming a great deal of time, and there was no danger the jury would confuse the issues involving McClendon with the issues it had to resolve in determining defendant's guilt at trial. The trial court therefore did not abuse its discretion under Evidence Code section 352.

## IV.    DISPOSITION

The judgment is affirmed.

_____
BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____
MIHARA, J.

_____
MÁRQUEZ, J.